2006 ME 86

**RIVER DALE ASSOCIATION et al.**

v.

**Andrew W. BLOSS et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Feb. 27, 2006.

Decided: July 18, 2006.

---

Thomas V. Laprade, Lambert Coffin, Portland, for plaintiffs.

Alan E. Shepard, Shepard & Read, Kennebunk, for defendants.

Panel: CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

SILVER, J.

[¶ 1] Andrew W. Bloss appeals from a judgment of the Superior Court (York County, *Brennan, J.*) granting, in part, River Dale Association's motion for summary judgment and requiring Bloss to replace the vinyl siding on the front of his house with a covering made from natural material pursuant to the restrictive covenant contained within his deed. River Dale Association cross-appeals from the court's partial grant of summary judgment in favor of Bloss. Bloss contends that: (1) the court erred in its determination that the restrictive covenant prohibits vinyl siding, and (2) even if the court was correct in its interpretation of the covenant, it improperly weighed the relative hardships when fashioning the remedy. River Dale Association contends that the court erred in its determination that the covenant does not prohibit modular homes. We hold that the covenant is ambiguous, but affirm the judgment relative to the modular home on alternate grounds. Because a genuine issue of material fact exists concerning whether the covenant prohibits vinyl siding, however, we vacate the judgment in part.[1]

## I. BACKGROUND

[¶ 2] In 1970, or shortly thereafter, the River Dale subdivision was created in Ken-

---

1. Because there is a genuine issue of material fact concerning the interpretation of this provision of the covenant, we do not address the appropriateness of the remedy imposed by the court.

nebunk. The deed for each lot sold within the subdivision contains a restrictive covenant. The provisions of the covenant relevant to this appeal provide:

7. No structure of a temporary character, trailer, mobile home, basement, tent, shack, garage, barn or other outbuilding shall be used as a residence, either temporarily or permanently, on any lot. No house trailer or similar vehicle shall be brought upon, or be maintained, or be permitted to remain on said property. No home already constructed, whether meeting the requirements, restrictions and conditions contained herein or not, shall be moved onto said premises.

8. The exterior walls shall be covered with brick or stone masonry, clapboards, shingles, flush wood siding or equal. The use of simulated or artificial brick or stone composition sidings shall not be permitted.

[¶ 3] In the summer of 2003, Bloss purchased a lot in the River Dale subdivision. Subsequently, he purchased a modular home that was delivered to the lot in four sections and assembled on site. The exterior walls of the home were covered with vinyl siding. In February 2004, River Dale Association filed a complaint in the Superior Court alleging that both the modular home itself and the vinyl siding violate the restrictive covenant contained in Bloss's deed.

[¶ 4] Bloss filed a motion for summary judgment, which the court granted in part and denied in part. The court granted Bloss's motion as to the modular home, but denied it and granted summary judgment in favor of River Dale Association as to the vinyl siding. The court concluded that the plain meaning of a "home already constructed," as provided by part seven of the covenant, could not be read "to include the disassembled quarter sections of a modular home." On the other hand, the court concluded that the phrase "or equal," in part eight of the covenant, was limited to traditional, natural materials as provided in the list that precedes that phrase. Following a bench trial on the issue of injunctive relief, the court ordered Bloss to replace the vinyl siding on the front of the house within ninety days, and further ordered that whenever the house is sold or ownership is transferred, the remaining siding must be replaced. This appeal and cross appeal followed.

## II. DISCUSSION

[¶ 5] "We review a ruling on a motion for summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party, to decide whether the parties' statements of material fact and referenced record evidence reveal a genuine issue of material fact." *Rice v. City of Biddeford*, 2004 ME 128, ¶ 9, 861 A.2d 668, 670. "A material fact is one having the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "A genuine issue exists when sufficient evidence supports a factual contest to require a factfinder to choose between competing versions of the truth at trial." *Id.*

[¶ 6] Construction of a deed, including a restrictive covenant, is a question of law that we review de novo. *Green v. Lawrence*, 2005 ME 90, ¶¶ 7–8, 877 A.2d 1079, 1082. The language must be given its ordinary meaning, and if there is no ambiguity the plain meaning controls. *Id.* ¶ 7, 877 A.2d at 1082. If the language is ambiguous, then extrinsic evidence may be consulted to ascertain the grantor's intent. *Id.* Language is deemed ambiguous when it "is reasonably susceptible of different interpretations." *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 15, 818 A.2d 1039, 1046 (quotation marks omitted).

## A. Modular Home

[¶ 7] The specific language at issue is the following: "No home already constructed, whether meeting the requirements, restrictions and conditions contained herein or not, shall be moved onto said premises." River Dale Association argues that a home comprised of four prefabricated sections constitutes a "home already constructed," and is, therefore, prohibited by the plain language of the covenant. Conversely, Bloss argues that his modular home was not prohibited by the covenant because it was not a "home," in its ordinary meaning, until the pieces were first assembled. Thus, his home was not a "home already constructed" because it was not assembled prior to its assembly on his lot.

[¶ 8] The ordinary meaning of "home" is: "1. A place where one lives: RESIDENCE. 2. The physical structure within which one lives." WEBSTER's II NEW COLLEGE DICTIONARY 529 (2001). The ordinary meaning of "construct" is: "1. To put together by assembling parts: BUILD." *Id.* at 242. Undertaking a plain-meaning analysis, it is unclear whether a modular home constructed from four prefabricated sections constitutes a "home already constructed"—a phrase that is reasonably susceptible to different interpretations. Although it is true that Bloss's home was not a fully constructed home until after it was delivered to the River Dale lot and the sections were assembled, it was substantially constructed prior to being moved onto the premises. A modular home such as the one at issue here could be distinguished from a traditional stick-built home that, although it may contain some prefabricated pieces, is constructed on site. Thus, the restrictive covenant is ambiguous and we must resort to extrinsic sources to attempt to ascertain the intent of the grantor.

[¶ 9] In his statement of material facts filed in support of his motion for summary judgment, Bloss states that John Downing, the developer who drafted the restrictive covenant, did not intend the language "[n]o home already constructed," to prohibit modular homes. To support this statement, Bloss cites to Downing's affidavit in which Downing states that he did not intend to prohibit modular homes. River Dale Association denies Bloss's statement and cites to Downing's deposition and the affidavit of Russell Lashua, another homeowner in the subdivision, to support its contention that Downing could not recall the original intent behind the language at issue.

[¶ 10] Viewed in context, however, the portions of the record cited by River Dale Association do not create a genuine issue of material fact. Although Downing did acknowledge that the covenant was drafted over thirty-five years ago, and that it is difficult to remember details from that many years ago, he did not express an inability to recall his intent when drafting the covenant, which was to prohibit existing homes from being moved into the subdivision. Similarly, when Lashua approached Downing about Bloss's home, Downing told Lashua that he wanted to confer with his attorney with whom he drafted the covenant, not because he could not remember his intent, but because he wanted to be absolutely sure that his memory was accurate. Finally, Downing's intent to permit modular homes is verified by the fact that he actually constructed two modular homes within the subdivision. Accordingly, there is no need for the factfinder to choose between competing versions of the truth at trial; the covenant does not prohibit modular homes.

## B. Vinyl Siding

[¶ 11] The provision at issue provides: "The exterior walls shall be covered

with brick or stone masonry, clapboards, shingles, flush wood siding or equal. The use of simulated or artificial brick or stone composition sidings shall not be permitted." Bloss argues that the terms "shingles" and "clapboards" are generic terms that do not qualify the material from which they may be composed. Thus, Bloss argues, vinyl siding should be considered the "equal" of the specifically listed types of siding. River Dale Association argues that the covenant, through the items specifically listed, limits the materials that may be used to cover the exterior walls of homes to natural materials. Thus, River Dale Association contends, the term "equal" cannot be interpreted to expand what materials are acceptable.

[¶ 12] The ordinary meaning of "shingle" is: "1. A thin oblong piece of material, as wood or asbestos, laid in overlapping rows to cover the roofs and sides of houses." *Id.* at 1018. Given its ordinary meaning, the term "clapboard" means: "A long, narrow board with one edge thicker than the other, overlapped to cover the outer walls of frame houses." *Id.* at 206. Based on the plain meaning, the term "shingles" is not necessarily limited to traditional, natural materials. Vinyl siding is not "equal" to "shingles" in design, however. On the other hand, vinyl siding is equal to "clapboards" in design, although not composition. Furthermore, the specific exclusion of "simulated or artificial brick or stone composition sidings" could be interpreted as an effort to exclude artificial sidings as a class, or, on the contrary, to prohibit artificial brick or stone sidings only. Accordingly, the intent of the drafter cannot be ascertained from the plain meaning of the language and we must resort to extrinsic sources.

[¶ 13] As in the context of modular homes, Bloss states in his statement of material facts that Downing did not intend to prohibit vinyl siding. Again, he cites Downing's affidavit, in which Downing states that he did not intend to prohibit vinyl siding. River Dale Association denies Bloss's statement, again citing to Downing's deposition and Lashua's affidavit. In contrast with the intent expressed by the phrase "[n]o home already constructed," there is a genuine issue of fact concerning what was intended by the phrase "or equal." During his deposition, Downing admitted that there were a number of types of siding in use prior to 1970 that were not mentioned in the covenant, including vinyl, but also stated that he was not aware of vinyl siding at the time he drafted the covenant. Therefore, it is unclear whether Downing would have considered vinyl siding to be "equal" to the sidings listed in the covenant. Also, and in significant contrast with modular homes, Downing never constructed, or approved construction of, a home with vinyl siding within the River Dale subdivision. Thus, whether the covenant permits the use of vinyl siding is a genuine issue of material fact. Therefore, the grant of summary judgment must be vacated.

The entry is:

Judgment affirmed in part and vacated in part. Remanded to the Superior Court for further proceedings consistent with the opinion herein.